Pearson, C. J.
 

 At June Term, 1866, upon the request of Governor Worth, the Judges of this court certified to him an opinion in these words:
 

 Raleigh, June 21st, 1866.
 

 His Excellency,
 
 Governor Worth:
 

 In reply to your communication of the 20th instant, I have the honor to say the Judges concur in the opinion that the word “ Crime,” in the act of Congress to which you refer, embraces all offences against the public, of an aggravated or infamous character, as contradistinguished from trivial
 
 *65
 
 offences to which the milder term “misdemeanor” is applied. The dividing line is not plainly marked in the books, and to convey the meaning we must resort to instances.— An assault with intent to commit felony, a conspiracy, cheating- with false tokens, are “ crimes.” An ordinary assault and battery, retailing without license, are misdemeanors.
 

 In determining what is a crime, it is proper to be governed by the laws of the State in which the offence is alleged to have been committed.
 

 The grade of offence may be considered as marked by the punishment. If it be infamous or degrading, as the jail or penitentiary, the offence is a crime, and properly associated with “treason” and “felony.” If the punishment be only a fine, the offence is a misdemeanor, and is excluded from the operation of the act of Congress by the words “ treason and felony.” “
 
 Noscitur a sociis.”
 

 (Signed,) R. M. PEARSON,
 

 Chief Justice N. C.
 

 The opinion covers almost the whole ground. It was properly conceded on the argument by Mi*. Bragg, that in regard to points of law the court has power, as a co-ordinate branch of the government, to review and control the action of the Governor under a writ of
 
 Habeas Corpus.
 
 On the other hand it was conceded by Mr. Graham that, in regard to any matter within the discretion of the Governor, the court had no right to interfere.
 

 It was urged by Mr. Graham, 1st, that cheating by false
 
 pretence,
 
 as distinguished from false
 
 token,
 
 was not a crime' at Common Law, and was made a crime by statute in the State of New York
 
 after
 
 the adoption of the Constitution of the United States, and consequently is not embraced by the word “ crime ” as used in that instrument.
 

 It may be that in the construction of-a treaty between in
 
 *66
 
 dependent nations, where a particular offence is specified, “forgery” for instance, as in Windsor’s case, cited in Wheaton Int. Law, 117, it was well decided that what was or was not “forgery” depended on the state of the law at the date of the treaty, and that a. statute passed afterwards making “ a false entry, by a clerk in bank
 
 ” forgery,
 
 was not embraced by the treaty. Ours is a different case. We are not putting a construction upon a treaty between independent nations; we are putting a construction upon a
 
 Constitution
 
 “ adopted by the people of the United States in order to form a more perfect Union, establish justice,” &c. In this instrument we find a provision that any person charged with treason, felony or other crime, shall be delivered up, &c. The words are general; no specific offence, as forgery, is named, and, in the very nature of things, this being a part of the fundamental law of the United States, has reference to such changes in the Criminal Law as might thereafter be made in any State of the Union; so the position that a rule of construction which may have been properly applied to a treaty, is applicable to the Constitution of the United States, is untenable. The clause under consideration should be construed, in connection with the clause immediately preceding, “ the citizens of each State shall be entitled to all the privileges and immunities of citizens in the several States,” and, as by the one, a citizen of North Carolina going to the State of New York is entitled to all the privileges of a citizen of that State, it is jslainly the meaning of the other to subject him to punishment for violating its Criminal Law, as if he were a citizen of that State, and to take away all chance of
 
 dodging behind State lines.
 
 It is clear that the facts set out by the indictment in this case constitute a crime according to the statute of New York, as construed by the courts of that State.
 

 2. It was argued in the second place that, as the prisoner had been heretofore delivered up by Gov. Worth, and was
 
 *67
 
 allowed to leave the State of New York, upon entering into a recognizance for his appearance, the Governor had no power to order his arrest a second time, either on the ground that his power having been once executed had spent its force, or on the ground that a forfeiture of the recognizance was an atonement for the offence. Neither of these positions can be maintained. It may be that had the prisoner been discharged for want of prosecution, it would be in the discretion of the Governor to refuse to order his arrest a second time; but where a recognizance is taken, and the prisoner fails to appear, the power of the Governor to order a second arrest cannot be questioned. The suggestion that a forfeited recognizance is to be treated as an atonement for the offence, does not admit of discussion.
 

 It follows that the prisoner must be remanded, provided Jonathan Worth is rightfully filling the office of Governor of the State of North Carolina. That point was not made on the argument, but as the objection has been gravely urged elsewhere, a decent regard for pu blic opinion makes it proper to state the grounds on which it is believed that the offices of the State are rightfully filled. See
 
 State
 
 v. Lane, 4 Ire., 434.
 

 The whole matter depends upon the question, Was the Convention of 1865 a rightful Convention for the purpose of reorganizing the State government, or was it an “ unlawful assembly ?”
 

 1st. It is said that the President had no power to cause measures to be adopted for calling the Convention, and that his act was one of usurpation and in violation of the Constitution of the State.
 

 It is provided by the Constitution of the State, Art. 4, sec. 1, “No Convention of the people shall be called by the General Assembly, unless by the concurrence of two-thirds of all the members of each House.”
 

 The Convention was not called in pursuance of this provision; and it may be conceded that if the Convention had
 
 *68
 
 been called
 
 prior to
 
 the revolt and surrender, it would have been an “ unlawful assemblybut the Convention was not called until
 
 after
 
 the State had revolted and been subjugated. This makes the difference.
 

 The Convention was not in pursuance of the Constitution of the State, nor was it in violation of that instrument. It was neither constitutional nor unconstitutional, but
 
 extra
 
 constitutional; that is, it met at a time and under circumstances not provided for by the Constitution. It was the creature of the emergency- — -the only mode by which it was possible to extricate the State from the condition of anarchy into which it had fallen, by the attempt to withdraw from the Union, which resulted in subjugation.
 

 The frame of the government of the State still existed; there was the machinery, but no hands to work it; there were the offices, but no officers qualified to discharge the duties. Those officers who hold during good behavior had been required to renounce their allegiance to the government of the United States and to take an oath to support the government of the Confederate States. Such officers as had been elected or appointed, after the revolt, were required to take a like oath. It is provided by the Constitution of the United States, Article VI, clause 3, “ The Senators and Representatives before mentioned, and the members of the several State Legislatures, and all Executive and Judicial officers, both of the United States and the several States, shall be bound by oath to support this Constitution.” No one of the State officers was bound by an oath to support the Constitution of the United States, and consequently no one of them was qualified to discharge the duties of their respective offices. There was no Governor, no members of the General Assembly, no Judges. Every officer in the State was politically dead, and the effect the same as if they had all died a natural death. How could the government of the United States recognize, as rightful officers of the
 
 *69
 
 State, men who were not bound by the oath required by the Constitution, but on the other hand were bound by an oath to support another government, and who had been elected or inducted into office at a time when the State was in open war with the United States ?
 

 Here, then, was a state of anarchy. No Convention could be called by the General Assembly, for there were no persons qualified to act as members of the General Assembly, and there was no way to have the State offices filled, whether Executive, Legislative or Judicial, except by a Convention of the people. In this condition of things, so far from its. being a matter of complaint, it was fortunate that the President of the United States, either as President under the Constitution, or as Commander-in-Chief of the conquering army, under the law of nations, had power, without reference to the Constitution of the State, to appoint a Provisional Governor, and, through his instrumentality, so to provide that the people of the State might, in a quiet and orderly manner, elect delegates to a Convention, and thereby give the wheels of the State government a new start.
 

 If we consider the State, after the revolt and surrender, in the condition of an independent nation that had been conquered, (and this is the most favorable light in which the subject can be viewed, for thereby the question is relieved from the imputation of treason,) a well settled principle of the law of nations makes it the duty of the conquering nation to take cave that the people conquered shall be provided with laws, or shall be allowed to provide themselves with laws, and thereby prevent a state ol anarchy.
 

 The act of the President, so far from being a usurpation, was a discharge of this duty in its mildest form; and the people of the State did accordingly avail themselves of the opportunity thus presented, and did elect delegates to the Convention; it follows, that their assembly was a rightful Convention of the people.
 

 
 *70
 
 2d. It is said, in the second place, assuming that the Government of the United States had power to adopt the necessary measures to enable the people of the State, in a quiet and orderly manner, to elect delegates to a Convention, the act of the President excluding a portion of our best citizens from the right to vote for, and be eligible as, delegates, was in violation of our fundamental law, and such an act of despotism as to make the Convention an unlawful assembly, and the whole proceeding void and of no force.
 

 Here again the same fatal error underlies the whole train of reasoning. It is strange that heated feeling could, in so short a time, divest the mind of all impression of the stern fact, that after a bloody war, the State had surrendered without stipulating for terms, (there being no terms except that the soldiers were allowed to go home unmolested) and lay prostrate with no further power of resistance, her people taking the amnesty oath, suing for pardon, and asking in the name of humanity, and the principles'recognized by the law of nations, to be saved from the horrors of anarchy!
 

 We were not in a condition to invoke the aid of “our fundamental laws” — the proceeding was avowedly extra-constitutional, and we could appeal only to the laws of nations. Whether the portion thus excluded constituted the best or the worst of our citizens, and whether the number excluded amounted to 100 or 500, does not affect the principle, and such extraneous circumstances should be put out of view.
 

 We have then this state of facts: After a surrender without stipulating for terms, the United States Government undertakes, in discharging the duty imposed by the law of nations, to relieve our citizens from a state of anarchy; and to this end it seemed good to the Government of the United States to permit the people of the State to elect delegates to a Convention, but to exclude from the privilege of voting for, and being eligible as delegates, those citizens, who,
 
 *71
 
 having participated in the war, had
 
 not obtained
 
 pardon. The question is, was this exclusion a violation of the law of nations, and an act of despotism ?
 

 We have seen that, according to the law of nations, the conquering nation may either impose such laws as to it seems fit, or may allow the citizens of the conquered nation the privilege of framing laws for itself. Can any principle be suggested, which forbids the conquering nation, in adopting this latter and milder course, to exclude from this privilege those citizens, whom it deems dangerous and not fit to be trusted ? In other words, does the fact that a portion of the citizens are not considered fit to be trusted, impose upon the conquerer the alternative, either to adopt the harsher course of imposing such laws as he sees fit, or to wait until such time as he can be assured that all of the citizens have become fit to be trusted, and in the meantime keep the conquered country under military law, or leave it in a state of anarchy
 
 ?
 
 If this were so, it would be in the power of a handful of men, who choose to hold out in opposition, after the nation is subjugated and the country in possession of the conqueror, to force him to impose such laws as he sees fit, or else to continue his military rule or leave the country in anarchy. If the conqueror has, by the law of nations, a right to impose such laws as he deems fit, why may he not confer the privileges of framing the laws upon such portion of the citizens as in his opinion are worthy of the trust ? The greater includes the less, and upon what ground can those whom he deems unworthy of the trust complain that the privilege is not also conferred on them ? A naked statement is sufficient to dispose of the question, and it is almost too plain to talk about, when we bear in mind that it must be judged of by the law of nations, and that we are not in a condition to restrict the will of the conqueror by invoking our fundamental law. Take the most recent application of the law of nations. Hanover is deprived of its King and of
 
 *72
 
 its government and laws, and annexed to Prussia, for such is the
 
 will
 
 of the conqueror; and this is done according to the law of nations. Can we look to that law for a principle by which to restrict the conqueror, if he sees fit to adopt the milder course, and
 
 ¡out him under an obligation
 
 not to exclude any portion of our citizens from the privilege of participating in framing the laws ?
 

 It is true, should a conqueror, while professing to allow the citizens the privilege of framing laws for themselves, exclude the greater part of them and confine it to a few who may be deemed tools of his, it would detract from the magnanimity of the act, and be, in effect, the same as if he had imposed such laws as he saw fit. There is no ground to support a suggestion of the kind in this case, and even if there was, it could not affect the principle.
 

 3. Fratricide is a more heinous crime than the killing of one with whom there is no tie of kindred. Civil war is more aggravated than a war with a foreign nation, and the conclusion in favor of the power of the United States, and the manner of its exercise, receives additional support by taking into view the fact that our State is not an independent nation, but is a member of the Union, and the attempt to withdraw, and the war consequent thereon, was a revolt, and subjected our citizens, who participated in it, to the charge of treason, unless the State
 
 had a right to
 
 secede.— That question we must suppose to have been settled by the result of the war. So the government of the United States, in discharging the duty imposed upon it by the law of nations, and the provision of the Constitution which requires it to guarantee to every State a republican form of government, was fully warranted in considering those individuals, who had not been pardoned, as still disaffected, and not worthy to be trusted in the work of re-organizing the State-government. Ours is a complicated form of government r the citizen takes two oaths of allegiance, one to the govern
 
 *73
 
 znent of the State, the other to the government of the United States, and both governments
 
 act directly upon the individual
 
 So, when the State attempted to withdraw, and revolted, a condition of things was presented which was not provided for in either Constitution, and seems not to have been contemplated by the framers. The citizens were obliged to violate their allegiance either to the one government or the other. Those who made their election to adhere to the State violated their allegiance to the United States, and those who elected to adhere to the United States violated their allegiance to the State. Although this unforeseen condition of things, which forced upon us the necessity of violating our allegiance to the one government or the other, cannot be deemed a
 
 justification
 
 of such of our citizens as elected to adhere to the State, (except upon the assumption that the State had a right to secede,) yet it is certainly a mitigation of the wrong; and to this is to be ascribed, in a great measure, the proclamation of general amnesty, and the liberality with which pardon has been granted, to such as fell in the excepted classes. A portion of our citizens had not obtained pardons. Did this fact put the government of the United States to the alternative of waiting until such time as all of these persons should approve themselves fit persons for pardon, and, in the meantime, continue the military occupation of the State, or leave it in a condition of anarchy, without legislative, judicial or executive officers, or else to allow those who, being unpardoned, were looked upon by the government of the United States as traitors, to participate in forming a Convention for the purpose of providing measures to fill the State offices ?
 

 It seems to us very clear that the exclusion of these persons was not a violation of the law of nations, or the clause of the Constitution above referred to, and that, so far from the act of the President being one of usurpation and despotism, he could not consistently have done otherwise. These
 
 *74
 
 persons either had applied for pardons which were refused,, for reasons of which he was the sole judge, or else had omitted to apply, because they were unwilling to take the oath of allegiance to the United States, or because they persisted, in the opinion that they had committed no act which needed! a pardon.
 

 Suppose the President had caused these persons to be arrested, and they were confined on the day of election, and thus practically excluded from voting and acting as delegates to the Convention, would that fact have put it out of the power of the President to enable the people to hold a Convention ? No one will so contend ; and yet their exclusion by the proclamation was the same in effect, saving the-omission of the harsher part, that is the arrest and confinement, which occurred in only one instance. So, to urge the-exclusion of this handful of unpardoned traitors, as the government of the United States considered them, as a ground for holding the Convention to be an unlawful assembly, and as a consequence that the State has had, and still has, no-Governor, members of the Legislature, Judges or other-officers, -who can rightfully fill their respective offices, is “ to-trifle with a grave subject.”
 

 4. Whether the act of the President was one which required the concurrence of Congress, is a question into which we need not enter; for, taking it to be so, Congress has, in many ways, recognized and confirmed the action of the-President in regard to the re-organization of the State Government by filling its offices. No other need be referred to-than the joint resolution by which certain amendments to fhe Constitution of the United States are proposed to the Legislature of the State of North Carolina, for adoption or rejection, thereby recognizing the Legislature as a lawful body, and, of course, recognizing in like manner the Convention under whose authority the members of the Legislature were elected. Indeed, although there may be some
 
 *75
 
 diversity of opinion, upon the question as to the power of the President, without the concurrence of Congress, to enable the people of the State to take measures by which to resume a Constitutional relation as one of the States of the Union, (about which we wish to intimate no opinion, because it is not involved in the matter under consideration,) there would seem to be no doubt as to the power of the Executive, either as President or as Commander of the army, to .appoint a Provisional Governor,-and through his instrumentality enable the people of the State to meet in Convention and take measures to fill the State offices. We have seen that, according to the law of nations, it is not only the right, but the duty, of the conquering nation either to impose a government on the conquered people, or to allow them to frame one for themselves, so as to prevent a condition of anarchy. When the President entered upon the discharge of this duty, it surely was not for the conquered people to question his powers, and the mere non interference of the Legislative branch of the government was such an acquiescence as to amount to a sanction, on its part, of all acts which, by the law of nations, it was the duty of the conquering nation either to do or to allow to be done.
 

 At all events
 
 it seems to us entirely clear that the officers of the State, who have been by this means and in this manner chosen and inducted into office, have rightful jurisdiction and power to discharge the duties of their respective offices, until some other provision shall be made for the government of the people.
 

 5. We do not enter upon the question in regard to the extent of the power of the Convention, for it is certain that, if rightfully convened, it had power to adopt all measures necessary and proper for filling the offices of the State, which is the only question now under consideration...
 

 It is considered that the prisoner be remanded.
 

 Per Curiam. Prisoner remanded.